**MODESTO IRRIGATION DISTRICT, Plaintiff,**

v.

**PACIFIC GAS & ELECTRIC COMPANY, and Dynergy Power Services, Inc., as successor to Destec Power Services, Inc., Defendants.**

**No. C–98–3009 MHP.**

United States District Court, N.D. California.

Aug. 20, 1999.

Scott T. Steffen, Modesto Irrigation District, Modesto, CA, Maxwell M. Blecher, Blecher & Collins, PC, Los Angeles, CA, for plaintiff.

Robert A. Mittelstaedt, Pillsbury Madison & Sutro LLP, San Francisco, Ca, for Destec Energy, Inc., defendant.

Marie L. Fiala, Kirk G. Werner, M. Fehrenbacher Claire, Heller Ehrman White & McAuliffe, San Francisco, CA, for Pacific Gas & Elec. Co., defendant.

### *MEMORANDUM AND ORDER*

PATEL, Chief Judge.

On August 3, 1998, plaintiff Modesto Irrigation District, Inc. ("MID") filed this action alleging that defendants Pacific Gas & Electric Company ("PG & E") and Dynergy Power Services, Inc. ("DESTEC") refused to deliver wholesale electric power to NM in violation of federal and state antitrust laws and state tort laws. In particular, MID alleged (1) violations of section I of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, Cal.Bus. & Prof.Code §§ 16720 *et seq.*, California's antitrust statute by both PG & E and DESTEC; (2) tortious interference with contract and with prospective business relationship against PG & E alone; and, (3) breach of contract against DESTEC. The court dismissed MID's federal and state antitrust claims on February 2, 1999, on defendants' motion, but granted MID leave to amend its complaint. *See Modesto Irrigation Dist. v. Pacific Gas & Elec.*, Case No. 98–3009 MHP, slip op. at 12–13 (N.D.Cal., Feb. 2, 1999) ("February order").

MID subsequently filed a first amended complaint ("FAC") on March 4, 1999, adding to the factual allegations in its original complaint and raising two additional causes of action: (1) violations of section 2 of the Sherman Act, 15 U.S.C. § 2, against PG & E and DESTEC, and (2) conspiracy to violate section 2 against PG & E and DESTEC. Again before the court is defendants' motion to dismiss MID's federal and state antitrust claims. Having considered the parties' arguments and submissions, the court enters the following memorandum and order.

## BACKGROUND

Plaintiff MID is an irrigation district, a public agency created under the authority of the California Water Code, which owns and operates facilities for the generation, transmission and distribution of electric power. FAC, at ¶ 4. MID provides retail electric service in Stanislaus, Tuolumne, San Joaquin and Contra Costa counties, and wholesale electric service throughout the western United States. *Id.* Defendant PG & E is an investor-owned public utility engaged in the generation, transmission and distribution of electricity in northern and central California.[1] FAC, at ¶¶ 7, 10. PG & E sells and delivers electric power to both retail and wholesale consumers and separately sells transmission services to resellers of electric power. *Id.* at ¶¶ 9–10. As the predominant wholesaler and retailer of electric power in northern and central California, PG & E dominates and controls facilities for the transmission of electricity within its California service territory. *Id.* at ¶ 10. According to MID, PG & E and MID are in "actual and potential competition" to supply residential and industrial consumers with electric power. *Id.* at ¶ 12. Finally, DESTEC, a subsidiary of Dynergy Corporation of Houston, Texas, is a wholesaler of electric power, which is also referred to as a "power marketer." *Id.* at ¶¶ 6, 15.

The events at issue in this action concern the purchase and use of a "substation" ("Praxair substation") originally owned by Praxair, Inc. ("Praxair"), a large industrial consumer of electricity located in Pittsburg, California, and a retail customer of PG & E. FAC at ¶ 17. A "substation" is a facility which receives electric power at high voltage and transforms the power into lower, usable voltages. *Id.* at ¶ 16. MID alleges that PG & E, as the sole supplier of retail electric power in the geographic market of Pittsburg, possessed monopoly power and could control prices or exclude competition from the Pittsburg retail electric power market. *Id.* at ¶ 19. MID further alleges that significant barriers allow PG & E to limit the access of competitors such as MID to the retail electric power market in the vicinity of Pittsburg. *Id.* at ¶ 20. Among these barriers include PG & E's ownership or control of all the transmission lines and services supplying wholesale and retail electric power to Pittsburg and the impracticability of duplicating PG & E's local transmission services because of cost and regulatory barriers. *Id.* at ¶¶ 21–22. Finally, as a result of the exclusion of MID from the retail electric power market in the vicinity of Pittsburg, MID alleges that Praxair and other residential and commercial consumers of retail electric power have been deprived of the benefits of low-cost electric power. *Id.* at ¶ 28.

Prior to the events at issue in this action, DESTEC entered into a Control Area and Transmission Service Agreement ("CATSA") with PG & E which allowed DESTEC to utilize PG & E's electric transmission lines to deliver electric power to wholesale customers of DESTEC. FAC, at ¶ 15. DESTEC intended to use PG & E's transmission facilities to sell and deliver low-cost electric power purchased in the Pacific Northwest to California electricity consumers. Among other limitations, the CATSA prohibits DESTEC from using PG & E's transmission facilities to directly deliver electric power to end-user, or retail, customers of PG & E. *Id.* In accordance with the requirements of the Federal Power Act ("FPA"), 16 U.S.C. § 824d(c), and regulations promulgated thereunder, 18 C.F.R. § 35.1, the CATSA was submitted to the Federal Energy Regulatory Commission ("FERC") and became effective on April 14, 1995. Def. Request for Judicial Notice ("RJN"), Exh. 1 [*Pacific Gas & Elec. Co.*, 71 F.E.R.C. ¶ 61,045 (April 14, 1995) ]. As a result of the CATSA, DESTEC and PG & E were

---

1. "Generation" is the conversion of energy from fuel or other sources into electricity. "Transmission" refers to the transportation of electricity via high voltage lines from gen- eration facilities to distribution areas. "Distribution" involves the delivery and sale of electricity to ultimate retail and wholesale consumers. FAC, at ¶ 7.

direct competitors in the sale of wholesale electric power, but were not competitors with respect to the retail sale of electric power. FAC, at ¶ 15.

Because DESTEC was prohibited from selling electric power at retail under the CATSA, it determined that it could service the needs of retail power consumers and sell its low-cost electric power only if two critical elements could be satisfied. First, DESTEC would have to persuade a utility company permitted under state and federal law to sell electricity to retail consumers to purchase a substation. FAC, at ¶ 16. DESTEC could then supply its low-cost electric power on a wholesale basis to the utility company, which could then resell the electric power to retail electricity consumers via the substation. *Id.* at ¶¶ 16–17. Second, DESTEC would have to obtain PG & E's approval to allow DESTEC to deliver wholesale electric power to the substation under the terms of the CATSA. *See id.* at ¶ 23.

To put its plan into motion, DESTEC approached MID with a proposal that MID buy the Praxair substation and supply retail electric power consumers, such as Praxair and other residential and commercial consumers in the Pittsburg area, with low-cost DESTEC-supplied electric power via the Praxair substation. FAC, at ¶ 17. On March 21, 1996, DESTEC entered into a written Power Sales Agreement with MID, in which MID agreed to purchase the Praxair substation and DESTEC agreed to deliver power to MID at the substation. *Id.* At the same time, MID and the City of Pittsburg ("Pittsburg") entered into a "Permission Agreement" under which Pittsburg agreed to allow MID to provide retail electric power to its residents and "to offer City residents an alternative for obtaining electricity at more competitive rates." [2] *Id.* MID and Praxair also entered into a "Equipment Sales Agreement" for the purchase of the

Praxair substation that was expressly conditioned upon PG & E's approval of the substation as a valid "output point" for DESTEC under the CATSA. *Id.* at ¶ 18.

By letter dated January 30, 1996, DESTEC sought PG & E's approval to provide the necessary transmission services needed to allow DESTEC to deliver wholesale electric power to the Praxair substation under the terms of the CATSA. FAC, at ¶¶ 23–24. MID also sought to enter into an "interconnection agreement" with PG & E setting forth the conditions under which PG & E would provide transmission services to MID at the Praxair substation. *Id.* at 24. On February 26, 1996, PG & E denied DESTEC's request that PG & E deliver power to the Praxair substation. *Id.* at ¶ 24. In its opposition, MID also asserts that PG & E refused to grant MID's request to enter into an interconnection agreement as well. P's Opp. at 4. MID alleges that PG & E agreed to an identical request for the provision of transmission service by DESTEC in order to sell electric power wholesale to the Port of Oakland for later resale to Port tenants at retail. FAC, at ¶ 24.

Thereafter, DESTEC and PG & E commenced proceedings in several forums to resolve their dispute. DESTEC initiated an arbitration proceeding under the terms of the CATSA to compel PG & E to provide transmission service to the Praxair substation. FAC, at ¶ 25. PG & E filed suit in federal district court seeking to enjoin the arbitration, but no order issued. *Id.* PG & E also filed a petition with FERC to disallow the Praxair scheme, which was opposed by MID and DESTEC. *See* RJN, Exh. 3 [Petition for Declaratory Order filed September 28, 1996]; RJN, Exhs. 4–6. Prior to any resolution of these proceedings, DESTEC and PG & E entered into a settlement of their dispute, which included an amendment of the CAT-

---

**2.** Under the Permission Agreement, approximately one-half of the capacity of the Praxair substation would have been devoted to serving Praxair. FAC, at ¶ 18. MID intended to deliver the remaining one-half of the Praxair substation capacity to commercial and residential accounts in Pittsburg which were at that time served almost entirely by PG & E. *Id.* at ¶¶ 18–19.

SA which, in effect, prohibits DESTEC from supplying energy transmitted through PG & E to "substations."[3] FAC, at ¶ 26. MID alleges that in particular PG & E and DESTEC jointly agreed that DESTEC would not supply wholesale electric power to MID via the Praxair substation using PG & E's transmission services. *Id.* To induce DESTEC to agree to the CATSA amendment, PG & E agreed to "functionally assign" to DESTEC certain wholesale power contracts permitting DESTEC to market its low-cost electric power at much higher rates negotiated and contracted for by PG & E. *Id.*

On November 1, 1996, PG & E subsequently submitted the proposed amendment to the CATSA for approval and filing by FERC. FAC, at ¶ 27; RJN, Exh. 9 [PG & E's Application for Approval of Second Amendment to CATSA]. However, on December 12, 1996, PG & E and DESTEC jointly requested that FERC suspend consideration of the proposed amendment. *Id.;* RJN, Exh. 10 [Joint Req. of PG & E and DESTEC]. Although FERC has taken no action on either the application for approval or the subsequent request to suspend consideration, MID asserts that PG & E and DESTEC have abided by their agreement not to provide MID with electric power to the Praxair substation at wholesale prices. *Id.* As a result, MID alleges that as a result of the CATSA amendment PG & E has thwarted both the Power Sales Agreement between MID and DESTEC and the Equipment Sales Agreement between MID and Praxair. *Id.* Similarly, although the Power Sales Agreement required that both MID and DESTEC "use their respective good faith best efforts to timely negotiate and obtain the agreements and the regulatory approvals" necessary to implement the agreement, MID alleges that DESTEC abrogated the Power Sales Agreement. *Id.* at ¶ 28. These actions, taken together, frustrated

its plans to sell electric power to Praxair and to numerous commercial and residential electricity consumers in Pittsburg. *Id.* at ¶¶ 27–28.

MID first alleges that DESTEC and PG & E engaged in a "contract, combination and/or conspiracy" to unreasonably restrain competition in the wholesale and retail sale of electric power in PG & E's service area in northern and central California in violation of section I of the Sherman Act. FAC, at ¶ 29. According to MID, DESTEC and PG & E have entered into an agreement under which DESTEC will not sell electric power at wholesale for delivery to substations and will abandon its arbitration proceeding against PG & E in exchange for the assignment by PG & E of certain wholesale power contracts. *Id.* at ¶¶ 29–30. MID also alleges two claims based on section 2 of the Sherman Act: actual or attempted monopolization and conspiracy to monopolize. In Count Two, MID alleges that PG & E has attempted to monopolize and/or has monopolized the market for the retail distribution of electric power to Praxair and Pittsburg's electricity consumers. *Id.* at ¶ 36. Specifically, MID alleges that PG & E has refused to permit its transmission lines to be used by MID or DESTEC to supply wholesale electric power to the Praxair substation by improperly invoking various provisions of the CATSA agreement. *Id.* at ¶ 38. In doing so, MID asserts that PG & E has unlawfully exercised its monopoly power over its transmission lines. FAC at ¶ 40. In Count Three, MID also asserts that PG & E and DESTEC engaged in a conspiracy to monopolize the retail electric power market in the Pittsburg area. *Id.* at ¶ 48.

*LEGAL STANDARD*

A motion to dismiss for failure to state a claim will be denied unless it appears that the plaintiff can prove no set of facts which would entitle him or her to relief. *Conley*

---

**3.** Likewise, PG & E and MID reached a settlement agreement under which MID agreed to withdraw its opposition to the proposed CATSA amendment and submitted this proposed agreement to the CPUC for approval. How-

ever, the CPUC declined to approve the settlement agreement. RJN, Exh. 11 [*Re: Pacific Gas & Electric Co.,* No. 98–06–020 (June 4, 1998) ].

*v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Fidelity Financial Corp. v. Federal Home Loan Bank of San Francisco*, 792 F.2d 1432, 1435 (9th Cir. 1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987). All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986). Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a Rule 12(b)(6) motion. *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir.1987), *cert. denied sub. nom., Wyoming Community Dev. Auth. v. Durning*, 484 U.S. 944, 108 S.Ct. 330, 98 L.Ed.2d 358 (1987).

In the Ninth Circuit, "antitrust pleadings need not contain great factual specificity." *Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 648 (9th Cir.1981), *cert. denied*, 469 U.S. 1229, 105 S.Ct. 1230, 84 L.Ed.2d 368 (1985). "There is no special rule requiring more factual specificity in antitrust pleadings." *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980) (citing *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Bd. of Culinary Workers*, 542 F.2d 1076, 1082 (9th Cir.1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977)). However, as noted by many courts, the court need not accept legal conclusions asserted in the complaint even if pled as "facts" or conclusory allegations without more. *JM Computer Srvcs. Inc. v. Schlumberger Technologies, Inc.*, 1996 WL 241607, *2 (N.D.Cal. May 3, 1996) (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

## DISCUSSION

### I. Analytical Framework for the Sherman Act, Section 1

▆▆▆ Section 1 of the Sherman Act makes unlawful "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce among the States." 15 U.S.C. § 1. To state a claim for a violation of section 1 of the Sherman Act, a plaintiff must establish (1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition under a *per se* or rule of reason analysis; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged (i.e. "antitrust injury"). *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir.1988); *see also Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1453 (9th Cir.1983), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983) (plaintiff must show "contract, combination or conspiracy" under section 1 of the Sherman Act). "[M]ost antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997). However, some types of restraints are deemed unlawful per se if they have a "predictable and pernicious anticompetitive effect." *Id.*

In noting that section 1 of the Sherman Act requires that there be a "contract, combination, ... or conspiracy," the Supreme Court observed that a business "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 n. 27, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). Thus, section 1 does not proscribe "independent action." *Id.* However, "agreements not to

compete, with the aim of preserving or extending a monopoly," are unlawful under the Sherman Act. *Cf. Otter Tail Power Co. v. United States,* 410 U.S. 366, 376, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (citing *Schine Chain Theatres v. U.S.,* 334 U.S. 110, 119, 68 S.Ct. 947, 92 L.Ed. 1245 (1948), *overruled on other grounds Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771–72, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)). "A § 1 agreement may be found when 'the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Copperweld,* 467 U.S. at 771, 104 S.Ct. 2731 (quoting *American Tobacco Co. v. U.S.,* 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)).

## II. *Analytical Framework for the Sherman Act, Section 2*

 In contrast to section I of the Sherman Act, "[s]ection 2 claims tend to encompass a narrower range of anticompetitive behaviors specifically defined as monopolization and attempts to monopolize." *Amarel v. Connell,* 102 F.3d 1494, 1521 (9th Cir.1996). Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize ... trade shall be guilty" of an antitrust violation. 15 U.S.C. § 2. In essence, section 2 of the Sherman Act prohibits a monopolist's unilateral action, such as a unilateral refusal to deal, "if that conduct harms the competitive process in the absence of a legitimate business justification." *Image Technical Servs., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1209–10 (9th Cir.1997) (citations omitted), *cert. denied,* —— U.S. ——, 118 S.Ct. 1560, 140 L.Ed.2d 792 (1998). To state a claim for a section 2 monopolization violation MID must allege that PG & E: "(1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power." *See Image Tech.,* 125 F.3d at 1202. " 'Willful acquisition' or 'maintenance of monopoly power' involves 'exclusionary conduct,' not power gained 'from growth or development as a conse-

quence of a superior product, business acumen, or historic accident.'" *Id.* at 1208 (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). In the case "of a regulated utility struggling with dual regulation, bearing in mind that the utility is entitled to recover its costs of service and to provide its investors with a reasonable rate of return," an antitrust plaintiff must also establish a specific intent by the monopoly to engage in monopolistic conduct through "the actions of the utility, taken as a whole." *City of Anaheim v. Southern California Edison Co.,* 955 F.2d 1373, 1378 (9th Cir.1992) ("the requirement of specific intent is an appropriate way to erect a dike which is sufficient to prevent an untoward invasion of the land of legal monopolies by the sea of antitrust") (citing *City of Mishawaka v. American Elec. Power Co., Inc.,* 616 F.2d 976, 985–86 (7th Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981)).

 "The traditional claim for attempted monopolization arises when the danger of monopolization is clear and present, but before a full-blown monopolization has necessarily been accomplished." *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 541 (9th Cir.1991), *cert. denied,* 503 U.S. 977, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992). To prevail on a section 2 attempt claim, MID must establish: " '(1) a specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving 'monopoly power,' and (4) causal antitrust injury.'" *See Image Tech.,* 125 F.3d at 1202 (quoting *Rebel Oil Co., Inc. v. Atlantic Richfield, Co.,* 51 F.3d 1421, 1434 (9th Cir.)), *cert. denied,* 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). "The requirements of a § 2 monopolization claim are similar, differing primarily in the requisite intent and the necessary level of monopoly power." *Id.* (citing *California Computer Products, Inc.*

v. *International Business Machines Corp.,* 613 F.2d 727, 736–37 (9th Cir.1979)).

Common to both the monopolization and attempt to monopolize claims, "[s]ection 2 plaintiffs must also establish antitrust injury." *Id.* (citing *Cost Management Services, Inc. v. Washington Natural Gas Co.,* 99 F.3d 937, 949 (9th Cir.1996)). In order to survive a motion to dismiss under Rule 12(b)(6), an antitrust complaint "need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws." *Newman v. Universal Pictures,* 813 F.2d 1519, 1522 (9th Cir.1987), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988).

### III. *Analysis*

In support of its second motion to dismiss, defendants contend that (1) PG & E's unilateral refusal to provide transmission service to the Praxair substation is necessarily incidental to a valid petition to a federal agency immune from antitrust liability under the *Noerr–Pennington*[4] doctrine; (2) MID has failed to allege a sufficient "contract, combination or conspiracy" to state a claim for a section I of the Sherman Act violation or for a conspiracy to violate section 2 of the Sherman Act; (3) MID has failed to point to a cognizable theory under which to impose section 2 monopolization liability upon PG & E; and (4) that MID lacks standing because it has failed to plead a sufficient antitrust injury as a result of defendants' actions. Defendants finally ask the court to decline to exercise supplemental jurisdiction over MID's state law claims if MID's federal antitrust claims are dismissed.

### A. *Judicial Notice*

■ Defendants again ask the court to take judicial notice of numerous documents which relate to either the CATSA or subsequent amendments to the CATSA and regulations and other regulatory decisions promulgated by FERC. " '[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.' " *Fecht v. The Price Co.,* 70 F.3d 1078, 1080 n. 1 (9th Cir.1995), *cert. denied,* 517 U.S. 1136, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996) (quoting *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.), *cert. denied,* 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994)); *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1198 (9th Cir.1988) (holding that a district court's taking notice of the "proceedings and determinations" of prior related litigation does not necessitate treating the Rule 12(b)(6) motion as one for summary judgment). The court can take judicial notice of facts beyond the complaint and matters of public records such as pleadings in another action and records and reports of administrative bodies. *Anderson v. Calif. Republican Party,* 1991 WL 472928, *2 (N.D.Cal., Nov.26, 1991), *aff'd,* 977 F.2d 587 (9th Cir.1992) (table).

■ The court again finds that several of the documents submitted as part of PG & E's request for judicial notice are of the type capable of ready determination by resort to sources whose accuracy cannot be reasonably questioned. *See* Fed. R.Evid. 201(b). Of note is the "Joint Request of Pacific Gas and Electric Company and DESTEC Power Services, Inc. to Suspend Commission Consideration of Second Amendment to the Control Area and Transmission Service Agreement," RJN, Exh. 10 ["Joint Request"], and the PG & E Petition for Declaratory Order, RJN, Exh. 3. Both documents clearly show the date-stamp of FERC and refers to the docket number under which the request is filed, and is readily accessible through the Internet. *See* RJN, Exhs. 3, 10. Finally, the court takes judicial notice of PG & E's submission to FERC for filing and acceptance of its "Second Amendment to the

---

**4.** *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 669–70, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)

Control Area and Transmission Services Agreement" between DESTEC and PG & E for the same reasons as stated above. RJN, Exh. 9.

B. *Section 1 of the Sherman Act and Section 2 Conspiracy to Monopolize*

In its prior order, the court held that although MID attempted to characterize the events following PG & E's unilateral refusal to permit DESTEC to use its lines to supply wholesale electricity to the Praxair substation as some sort of "agreement" to engage in anticompetitive activity, it became clear at the hearing that defendants continue to operate under the CATSA and not as part of a speculative "agreement" intended to restrain trade. The court therefore finds that MID's allegations of an "agreement" fail to sufficiently describe an actionable "contract, combination, ..., or conspiracy" under section 1.

February order, at 12. In giving MID leave to amend its complaint, the court in essence asked MID "to articulate with ... clarity the nature of [the alleged] agreement." *Id.* at 11.

In again arguing that there could have been no section 1 violation because there was no agreement, defendants assert that MID has provided no new facts with which to support its claim that P G&E and DESTEC engaged in a conspiracy or concerted activity in violation of section 1.[5] MID, however, points to several allegations in its complaint which it maintains establish the existence of an agreement, combination or conspiracy. Plaintiff again initially points to its allegation that defendants:

> have been engaged in a continuing contract, combination and conspiracy to un-

reasonably restrain competition in interstate commerce in the wholesale and retail sale of electricity in PG & E's service area in Northern and Central California in violation of Section 1 of the Sherman Act.

FAC, at ¶ 29; *compare* Compl., at ¶ 23 (stating identical allegation). MID again asserts that this allegation is sufficient to state a claim under section 1. However, as held in the February order, "although antitrust pleadings need not contain great factual specificity, the court need not accept conclusory allegations or legal conclusions couched as facts." *See* February order at 10.

In subsequent paragraphs, however, MID alters somewhat the factual allegations forming the basis of its section 1 claims as alleged in its original complaint. Plaintiffs allege that:

> The aforesaid contract, combination and/or conspiracy have consisted of a continuing agreement among and between the named defendants that DESTEC will not sell electricity transmitted by defendant PG & E at wholesale for delivery at substations, including substations owned or to be acquired by plaintiff MID, and specifically including the Praxair substation in Pittsburg, California. Further, that DESTEC will forego its contention, set forth and presented in an arbitration proceeding that under the CATSA agreement, that PG & E was legally obligated to deliver power to DESTEC for resale to MID at the Praxair substation.[6]

FAC at ¶ 30. As before, MID continues:

> In furtherance of and as part of that agreement and to induce and persuade

5. Despite MID's protestations to the contrary, defendants again do not argue that the actions or regulatory authority of FERC or CPUC immunizes them from federal antitrust liability under the state action doctrine. *See* February order at 8 (noting cases holding that Federal Power Act ("FPA"), 16 U.S.C. § 824a(b), does not insulate electric power companies from operation of antitrust laws).

6. In paragraph 24 of its original complaint, MID stated:

> The aforesaid contract combination and conspiracy have consisted of a continuing agreement among and between the named defendants that defendant DESTEC will not sell electricity at wholesale for delivery at substations, including substations owned or to be acquired by plaintiff MID and specifically including the Linde substation in Pittsburg, California.

DESTEC to abandon the arbitration proceeding and to renege its planned wholesale electric sales to MID at the Praxair substation, defendants have entered into an agreement under which PG & E functionally assigned to DESTEC certain wholesale customers at prices vastly in excess of the market price. In effect, PG & E bribed DESTEC to give up its efforts to carry out its obligations to MID under the Power Sales Agreement. This contract, combination and/or conspiracy not to provide electric power to MID for retail resale constitutes an unreasonable restraint of trade.[7]

FAC at ¶ 31.

In contrast to its earlier allegations, MID has now shifted its focus from the "Second Amendment" to the CATSA as part of the settlement of defendants' arbitration dispute, see Compl. at ¶ 21, to an agreement to abandon the arbitration proceeding initiated by DESTEC and to "give up its efforts to carry out its obligations to MID under the Power Sales Agreement." FAC at ¶ 31. For instance, MID again alleges that "[a]s arbitration was about to conclude ..., PG & E and DESTEC entered into a settlement wherein they jointly agreed DESTEC would not supply energy to MID ... They also formulated a formal proposed amendment of their CATSA agreement ..." FAC at ¶ 26; compare Compl., at ¶ 21. MID again alleges that PG & E submitted the proposed CATSA amendment to FERC, but that PG & E and DESTEC jointly requested that

FERC suspend consideration of the proposed amendment. FAC at ¶ 27; compare Compl. at ¶ 21. MID finally concludes that "[a]lthough the FERC never ruled upon the proposed amendment, PG & E and DESTEC have nevertheless adhered to their explicit and/or implicit agreement not to supply power to plaintiff MID at the Praxair substation utilizing PG & E's transmission services." FAC at ¶ 27; compare P's Opp. to D's Mot. to Dismiss the Orig. Compl., at 15 (concluding that allegations in original complaint establish that "the intended goal of defendants' concerted conduct was nevertheless achieved, i.e., block MID from competing with PG & E" regardless of whether the CATSA amendment became effective).

Despite this shift in focus, the only allegations of a "contract, combination, ..., or conspiracy" in restraint of trade made in connection with MID's section 1 claim as alleged in Count One of the FAC are those raised in paragraphs 29, 30 and 31 of the FAC. MID fails to incorporate by reference into Count One the paragraphs preceding Count One, including those paragraphs containing specific allegations providing greater detail of the transactions between PG & E, DESTEC and MID, including various agreements, attempted agreements and unilateral acts. Since none of these paragraphs are specifically incorporated or referred to in the first cause of action the court cannot tell whether any of these relate to the section 1 claim. Furthermore, the court must

Compl., at ¶ 24. It further added in its opposition that PG & E's refusal to deal with either DESTEC or MID with respect to the Praxair substation also constitutes a section 1 violation: PG & E "refused to enter into an interconnection agreement with ... MID (and refused DESTEC's request pursuant to the CATSA) which would have permitted MID to resell electric power from the Praxair substation to Praxair and customers in Pittsburg." P's Opp., at 14 (citing Compl., at ¶¶ 18–20). MID concludes that these allegations, taken together or individually, establish that "the intended goal of defendants' concerted conduct was nevertheless achieved, i.e., block MID from competing with PG & E"

regardless of whether the CATSA amendment became effective. P's Opp., at 15.

7. In the parallel allegations in the original complaint, MID alleged that:

In furtherance of and as part of that agreement: defendants have entered into an agreement under which PG & E functionally assigned to DESTEC certain wholesale power contracts, which will enable DESTEC to sell power to its wholesale customers at prices vastly in excess of the market price in exchange for DESTEC agreeing not to sell power for delivery at substations. Compl., at ¶¶ 18 & 25.

confine its inquiry of whether MID has sufficiently stated a section 1 claim to those allegations contained in paragraphs 29, 30, and 31. In light of the generalized allegations contained in these paragraphs regarding the nature of the contract, combination or conspiracy, it is clear that the agreement alleged in the FAC is no different and no more specific than that found by the court to fail to state a claim upon defendants' earlier motion.

■ Nonetheless, although MID attempts to distinguish the factual allegations regarding the existence of an agreement in its original complaint from those newly asserted in the FAC, it is clear that MID reasserts the identical claim that PG & E and DESTEC "agreed" that DESTEC would not sell electric power at wholesale for delivery to substations and in exchange would acquire certain wholesale electric power contracts which permitted DESTEC to resell electricity at a substantial profit. *Cf. U.S. v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 182 (3rd Cir.1970), *cert. denied*, 401 U.S. 948, 949, 91 S.Ct. 928, 28 L.Ed.2d 231 (1970) ("no formal agreement is necessary to constitute an unlawful conspiracy; it is sufficient that a concert of action be contemplated and the defendants conform to the arrangement"). As this court held in the February order, the instant action at most involves a unilateral effort by PG & E to deny DESTEC's request that PG & E provide wholesale electric power to the Praxair substation. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In reaching its decision, the court again notes that MID has recourse to "other laws, for example, 'unfair competition' laws, business tort laws, or regulatory laws, [which] provide remedies for various 'competitive practices thought to be offensive to proper standards of business morality,'" such as the allegations of bribery contained in paragraph 30 of the FAC. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 119 S.Ct. 493, 498, 142 L.Ed.2d 510 (1998) (quoting 3 P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 651d, at 78 (1996)).

MID's allegations are insufficient to state a section 1 claim that PG & E and DESTEC engaged in a "contract, combination, ..., or conspiracy" in restraint of trade.

■ In contrast to its section 1 claim, MID in its third cause of action for conspiracy to monopolize under section 2 of the Sherman Act does incorporate by reference all preceding paragraphs and factual allegations. To state a conspiracy to monopolize claim under section 2, a plaintiff must set forth a specific intent to monopolize and the anticompetitive acts designed to effect that intent, "although in the conspiracy claim the act may be no more than the agreement itself." *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). "[N]o particular level of market power or 'dangerous probability of success' has to be alleged or proved in a conspiracy [to monopolize] claim where the specific intent to monopolize is otherwise apparent from the character of the actions taken." *Id.* Whereas MID's first cause of action fails to state a claim for being too generalized, its third cause of action fails for providing an excess of detail without pointing to the specific agreement that constitutes the basis of its conspiracy claim. In its FAC, MID points to a host of allegations specifying a number of agreements and activities but neglects to identify which of these run afoul of the antitrust laws and form the basis for this third claim. However, MID simply concludes that PG & E and DESTEC have "engaged in a continuing conspiracy to monopolize the market for the sale of retail electric power" without providing any direction as to the overt acts or agreements that constitute the conspiracy. *See* FAC, at ¶ 48.

■ Furthermore, MID provides only a general allegation of antitrust injury arising from its section 2 conspiracy claim, but fails to point to how any of the overt acts or agreements alleged resulted in the antitrust injury asserted. A plaintiff must establish "the existence of antitrust injury,

which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (citations and internal quotations omitted). That is, plaintiff must have suffered an injury which bears a causal connection to the alleged antitrust violation. *Associated Gen. Contractors of Calif., Inc. v. Calif. Council of State Carpenters*, 459 U.S. 519, 535, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). MID alleges in paragraph 45 that "[a]s a direct and proximate result" of the alleged violations it will be "immediately and irreparably injured." FAC, at ¶ 45. However, MID's allegation of antitrust injury is conclusory and does not provide any causal relationship between its section 2 conspiracy claim and an antitrust injury. As such, the court dismisses both Counts One and Three of MID's FAC in their entirety.

### C. *Noerr–Pennington Doctrine*

Defendants further argue that MID's antitrust claims are barred by the *Noerr–Pennington* doctrine because PG & E's refusal to wheel power to DESTEC was "necessarily incidental" to filing a FERC petition, which it contends constitutes a valid petitioning activity. Although defendants suggest that *Noerr–Pennington* immunity should extend to both MID's section 1 and section 2 claims, they direct their *Noerr–Pennington* argument primarily to MID's section 2 monopolization claim asserted in Count Two of the FAC. In Count Two, MID alleges that PG & E monopolized or attempted to monopolize the Pittsburg market for the retail distribution of electric power by unilaterally refusing to grant DESTEC's request for transmission services and by improperly invoking various provisions of the CATSA in doing so. *See* FAC at ¶ 38. As such, the court confines its analysis of *Noerr–Pennington* immunity to MID's section 2 claim based on PG & E's unilateral refusal to deal. In any event, the court need not consider PG & E's suggestion that *Noerr–*

*Pennington* immunity attaches to Counts One or Three of the FAC since MID fails to allege a sufficient contract, combination or conspiracy in violation of section 1 of the Sherman Act.

In opposition, MID maintains that the *Noerr–Pennington* doctrine is of no relevance to this action because it does not claim that defendants run afoul of the antitrust laws through their efforts to petition FERC, initiate litigation in the federal courts or to petition or solicit any other government agency or court. Rather, MID briefly argues that an alleged anticompetitive agreement between PG & E and DESTEC was not "incidental" to bringing a valid FERC petition because the agreement was solely the result of defendants' private actions, and not the result of any valid governmental action. In doing so, it wrongly asserts that *Noerr* stands for the proposition that *Noerr–Pennington* immunity attaches only where a restraint or monopolization is the result of valid government action, as opposed to private action. *See Noerr*, 365 U.S. at 136, 81 S.Ct. 523; *compare Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 503–06, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988) (citing *Noerr*, 365 U.S. at 143, 81 S.Ct. 523) (*Noerr* immunity extends to situations "where, independent of any government action, the anticompetitive restraint results directly from private action, the restraint cannot form the basis of antitrust liability if it is 'incidental' to a valid effort to influence governmental action"). Moreover, MID misconstrues its own complaint in asserting that its section 2 claim and resultant antitrust injury arises out of an alleged agreement between PG & E and DESTEC not to supply power to the Praxair substation. *See* FAC at ¶¶ 36–43 & 45–6. Finally, in an important concession, MID maintains that because the *Noerr–Pennington* doctrine does not apply it need not plead facts to establish that defendants' conduct falls within the "sham exception" to the *Noerr–Pennington* doctrine. *Cf. California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511, 92

S.Ct. 609, 30 L.Ed.2d 642 (1972) (no *Noerr* immunity if petitioning activity is "mere sham to cover ... an attempt to interfere directly with the business relationships of a competitor"); *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.,* 944 F.2d 1525, 1529 (9th Cir. 1991) ("the filing of a lawsuit is immune from the antitrust laws unless the suit is a sham"), *aff'd,* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993).

■ Under the *Noerr–Pennington* doctrine, one who files a lawsuit or otherwise petitions the government for redress is generally immune from antitrust liability unless such litigation or activity is a sham. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 669–70, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In *California Motor Transp.,* the Supreme Court adapted the *Noerr* doctrine to the judicial process in addressing the contention of the respondent out-of-state highway carriers that a group of in-state highway carriers conspired to monopolize the transportation of goods in California by instituting state and federal proceedings to resist and defeat applications by respondents to acquire operating rights within California. *Id.* at 509, 92 S.Ct. 609. In rejecting antitrust liability, the Court concluded that "it would be destructive ... to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors." *Id.*

Defendants maintain that PG & E's refusal to grant DESTEC's request to provide transmission service to the Praxair substation should be considered to be "incidental" to its filing of a petition to FERC seeking a declaration that "PG & E is not obligated to interconnect and provide transmission service" in connection with the agreement between DESTEC and MID to provide electric power to Praxair and other retail consumers of Pittsburg. *See* D's Exh. 3 [PG & E FERC Petition dated Feb. 28, 1996]. According to MID's allegations, DESTEC requested that PG & E provide to the Praxair substation transmission service under the CATSA by letter dated January 30, 1996. FAC at ¶ 24. "Simultaneously," MID requested that PG & E enter into a separate interconnection agreement under which MID could receive interconnection service at the Praxair substation. *Id.* On February 26, 1996, PG & E denied DESTEC's request. *Id.* A flurry of activity ensued after PG & E's denial of DESTEC's request: DESTEC initiated private arbitration proceedings under the terms of the CATSA to direct PG & E to provide transmission service; and PG & E filed a lawsuit in the United States District for the Northern District of California seeking an order enjoining arbitration. FAC at ¶ 25. Importantly, on February 28, 1996, PG & E filed its FERC petition. D's Exh. 3 [PG & E FERC Petition dated Feb. 28, 1996]. In the petition, PG & E alleges, among other things, that the proposed transaction between DESTEC and MID is a "sham wholesale transaction under the Energy Policy Act of 1992 ["EPAct"]," Pub.L. No. 102–486, 106 Stat. 2776 (1992), and that the transaction would undermine a scheme devised by the California Public Utilities Commission ("CPUC") to open up the electric power industry to greater competition at the wholesale and retail levels. *Id.* at i & 2. On March 26, 1999, MID filed an application with FERC as well in which it sought an order requiring PG & E to interconnect its transmission system with the Praxair substation and to agree to an interconnection agreement. D's Exh. 6 [MID FERC Petition dated March 26, 1999]. In light of the proximity in time of PG & E's rejection of DESTEC's wheeling request and its filing of a FERC petition, defendants maintain that the propriety of DESTEC's

request for transmission service to the Praxair substation was in dispute from the outset and that PG & E's refusal to wheel electric power was a "jurisprudential precondition" to PG & E's FERC petition.

In support of its argument, defendants point to *PrimeTime 24 Joint Venture v. National Broadcasting Co., Inc.*, 21 F.Supp.2d 350, 358–59 (S.D.N.Y.1998), in which the court held that a decision by defendants "not to negotiate with or grant to plaintiff a copyright license amounted to the rejection of a settlement offer and could not form the basis of antitrust liability." The plaintiff asserted that defendants engaged in concerted action in violation of federal antitrust laws by encouraging numerous lawsuits against plaintiff alleging copyright infringement and by refusing to deal with plaintiff in its efforts to negotiate a copyright license. In rejecting plaintiff's arguments, the court noted that "conduct or communication which is incident to or attendant upon effective litigation should also receive *Noerr* immunity." *Id.* at 356 (citations omitted). It reasoned that "[b]ecause pre-litigation communications provide useful notice of potential liability and facilitate the settlement of controversies, it would be foolish to adopt antitrust rules encouraging suit before communication by penalizing the communication but not the suit." *Id.* at 357 (internal citations and quotations omitted). Importantly, the court also held that defendants' refusals to negotiate a licensing agreement should "receive *Noerr* immunity because if the defendants had accepted [plaintiff's] offer and agreed to license it, any infringement dispute would be moot." *Id.* at 359.

The Ninth Circuit likewise has held that "[a] decision to accept or reject an offer of settlement is conduct incidental to the prosecution of [a lawsuit] and not a separate and distinct activity which might form the basis for antitrust liability." *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.*, 944 F.2d 1525, 1528 (9th Cir.1991), *aff'd*, 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). In *Columbia Pictures* the counterclaimants alleged that several movie studio counter-

defendants had engaged in anticompetitive conduct by filing a copyright infringement action against the counterclaimants and by subsequently concertedly refusing to grant copyright licenses. *Id.* at 1528. In rejecting the counterclaimants antitrust claims, the court noted that the counterclaimants request for copyright licensing "amounted to an offer to settle the lawsuit" and that the lawsuit would have been mooted by any agreement to license the copyrights at issue. *Id.* Similarly, in *Transphase Systems, Inc. v. Southern Calif. Edison Co.*, 839 F.Supp. 711, 716 (C.D.Cal.1993), plaintiff alleged that defendants violated section 1 by "appearing together before the CPUC to take positions that would disadvantage [plaintiff]" and by "speaking in unison before the CPUC to demand the fruits of their monopolies." *Id.* (internal quotations omitted). Plaintiff further alleged that defendants "maintained their monopoly power by 'resisting meaningful changes'" through the public positions they took in the CPUC proceedings in violation of section 2. *Id.* The court rejected plaintiff's claims in holding that defendants' petitioning activity before the CPUC was clearly protected by the *Noerr–Pennington* doctrine. *Id.*

In contrast, the Ninth Circuit has also held that "[a]pplying to an administrative agency for approval of an anticompetitive contract is not lobbying activity within the meaning of the *Noerr–Pennington* doctrine." *Columbia Steel Casting Co., Inc. v. Portland General Electric Co.*, 111 F.3d 1427, 1445–46 (9th Cir.1996). In *Columbia Steel*, the plaintiff-consumer of electric power brought an antitrust action against two electric utilities, both of whom were competitors in the Portland-area electric power market, charging them with violations of sections 1 and 2 of the Sherman Act by entering into an agreement to divide the City of Portland into exclusive service territories. *Id.* at 1432–33. After the state public utility commission ("PUC") approved an agreement between the utilities to exchange certain property and customer accounts, but not an alloca-

tion of exclusive service territories, plaintiff sought to purchase electricity from the lower cost utility. *Id.* at 1435–36. The competitor utility, however, refused to wheel power from the lower cost utility to plaintiff's casting plant, asserting that it had an exclusive right to service plaintiff's plant because the plant fell within its service territory. *Id.* at 1436. In response to the plaintiff's antitrust claims, the defendant utility company asserted that it was entitled to *Noerr–Pennington* immunity because it had sought the approval of the state PUC for the anticompetitive agreement. In rejecting defendants' contention, the court noted that "in any event" the defendant utility company was being held liable for entering into an agreement with a competitor to replace competition with area monopolies, and not for the filing of an application with the state PUC. *Id.* at 1445–46.

In essence, MID maintains that defendants' assertion of *Noerr–Pennington* immunity fails because PG & E's anticompetitive conduct was not "incidental" to bringing a valid FERC petition or other litigation. In doing so, it asserts that PG & E's refusal to wheel electric power to the Praxair substation occurred before it brought its FERC petition against DESTEC. It reasons that therefore PG & E's refusal was not "incidental" to its FERC petition and should not be accorded *Noerr* protection. However, it is clear that PG & E's refusal is akin to the refusals to negotiate or grant copyright licenses in *Columbia Pictures* and *PrimeTime 24*. PG & E's refusal to honor DESTEC's request to wheel power to the Praxair substation was clearly a precondition to its FERC petition seeking a declaration that the proposed transaction between DESTEC and MID was a sham wholesale transaction and any agreement to wheel power to the Praxair substation would have mooted PG & E's FERC petition.

The court thus finds that PG & E's refusal to honor DESTEC's request was "incidental" to its FERC petition and therefore falls within the scope of *Noerr–*

*Pennington* immunity. As such, the court dismisses in its entirety Count Two of the FAC. Finally, because MID alleges that its state law antitrust claims are bound up in the same conduct as and are ancillary to its federal antitrust claims, *see* FAC at ¶ 51, the court dismisses MID's Cartwright Act claim on parallel grounds. *See* Cal. Bus. & Prof.Code § 16720. *Cf. Vinci v. Waste Management, Inc.*, 36 Cal.App.4th 1811, 1814 n. 1, 43 Cal.Rptr.2d 337 (1995); *Cellular Plus, Inc. v. Superior Court (U.S. West Cellular)*, 14 Cal.App.4th 1224, 1232 n. 2, 18 Cal.Rptr.2d 308 (1993); *Redwood Theatres, Inc. v. Festival Enterprises, Inc.*, 908 F.2d 477, 481–82 & n. 3 (9th Cir.1990).

*CONCLUSION*

For the reasons set forth above, the court hereby GRANTS defendants' motion to dismiss MID's federal antitrust and Cartwright Act claims against DESTEC and PG & E. Furthermore, because MID's counsel is an experienced antitrust lawyer who knows how to prepare a well-pleaded complaint and the court has already provided MID with the opportunity to amend its complaint, the court denies MID any further leave to amend its complaint.

Finally, the court declines to exercise supplemental jurisdiction pursuant to section 1367(c)(3) over the remaining state law claims and DISMISSES these claims without prejudice. Under 28 U.S.C. section 1367(d), the statute of limitations on plaintiff's state law claims is tolled while claims are pending until thirty (30) days after an order of dismissal, thus allowing the plaintiff time for filing a new action in state court without a lapse of her rights.

This order fully adjudicates the motion reflected at Docket # 37 and the Clerk of the Court shall remove it from the pending motions list.

IT IS SO ORDERED.