**MODESTO IRRIGATION DISTRICT, Plaintiff,**

v.

**PACIFIC GAS AND ELECTRIC COMPANY, Defendant.**

No. C–98–3009 MHP.

United States District Court, N.D. California.

March 18, 2004.

Maxwell M. Blecher, Donald R. Pepperman, Blecher & Collins, P.C., Los Angeles, CA, Scott T. Steffen, Modesto Irrigation Dist, Modesto, CA, for Plaintiff.

Marie L. Fiala, Kirk G. Werner, M. Fehrenbacher Claire, Heller Ehrman

White & McAuliffe, Clifford J. Gleicher, Michael J. Kass, Pillsbury Winthrop LLP, Robert A. Mittelstaedt, Jones Day, San Francisco, CA, for Defendant.

### MEMORANDUM AND ORDER

PATEL, Chief Judge.

#### Motion for Summary Judgment

On August 3, 1998, plaintiff Modesto Irrigation District ("MID") filed a complaint in this court against defendant Pacific Gas and Electric Company ("PG & E").[1] In pertinent part, MID's complaint alleges that PG & E violated the Sherman Act, 15 U.S.C. §§ 1, 2, and related provisions of state law when it attempted to prevent MID from offering electric services in Pittsburg, California. On February 2, 1999, this court dismissed MID's clams under Federal Rule of Civil Procedure 12(b)(6), granting MID leave to amend. *See Modesto Irrigation Dist. v. Pacific Gas & Elec. Co.*, 61 F.Supp.2d 1058, 1067–68 (N.D.Cal.1999). MID filed its first amended complaint on March 4, 1999, and this court again dismissed the action under Federal Rule of Civil Procedure 12(b)(6). *See Modesto Irrigation Dist. v. Pacific Gas & Elec. Co.*, 61 F.Supp.2d 1058 (N.D.Cal.1999) (denying leave to amend). In an unpublished disposition, the Ninth Circuit reversed. *Modesto Irrigation Dist. v. Pacific Gas & Elec. Co.*, 54 Fed. Appx. 882 (9th Cir.2002).

Two weeks after the Ninth Circuit entered its decision, MID filed a second amended complaint in this court. The parties subsequently agreed that resolution of PG & E's eleventh affirmative defense (viz., that MID failed to comply with particular provisions of California law, thus eliminating the prospect of cognizable antitrust injury) might dispose of the action in its entirety; the parties also agreed that a summary judgment motion regarding PG & E's eleventh affirmative defense could be adequately briefed on stipulated facts and considered without additional discovery. Now before the court is PG & E's motion for summary adjudication of its eleventh affirmative defense. The court has considered the parties arguments fully, and for the reasons set forth below, the court rules as follows.

### BACKGROUND [2]

Pacific Gas & Electric Company, a California corporation, is authorized by the California Public Utilities Commission (PUC) to provide electric services to certain parts of California.[3] *See* Second Am. Compl., ¶¶ 3–12 (noting, *inter alia*, that PG & E is the predominate wholesaler and retailer of electric power in Northern and Central California, controlling most of the related facilities). An investor-owned utility ("IOU"), PG & E owns and operates facilities for the generation, transmission, and distribution of electric power through-

---

1. MID's complaint also identified Dynergy Power Services, Inc. ("Dynergy") as a defendant. Dynergy is the successor to Destec Power Services, Inc., a significant player in MID's attempt to grow into Pittsburg, California. MID has since settled its claims against Dynergy. For simplicity's sake, the court will refer to the company as "Dynergy" throughout this order.

2. Unless otherwise noted, all facts in this section have been culled from the parties' moving papers.

3. It is perhaps a bit of an oversimplification to say that PG & E merely provides electric distribution services. PG & E, to be precise, sells and delivers electric power to both "retail" and "wholesale" customers, the latter under a system referred to as "wheeling." The distinction between "retail" and "wholesale" services is important to understanding the contours of PG & E's relationship with Dynergy and the type of service MID hoped to offer Praxair, but it is not central to resolution of the motion before the court. The court will thus leave the distinction mostly unelaborated.

out much of Northern and Central California, including, notably, the City of Pittsburg. *See* Request for Judicial Notice, Exh. 8 at p. 3. As an IOU, PG & E is required to obtain a Certificate of Public Utilities Convenience and Necessity ("CPUCN") from PUC before it may develop or extend electricity-related facilities in specific service territories. *See* Cal. Pub. Util.Code § 1001; *see generally Greyhound Lines, Inc. v. Pub. Utilities Comm'n,* 68 Cal.2d 406, 412 & n. 3, 67 Cal.Rptr. 97, 438 P.2d 801 (1968) (noting that this certification process prevents waste of resources and protects IOUs against improper competition). During the period at issue in this litigation, PG & E held a CPUCN that permitted it to distribute electricity to all residents of Pittburg, California. *See* Stip. of Facts, ¶ 8. All residential and commercial residents of Pittsburg wishing to receive electric services did, in fact, receive electric services from PG & E. *See id.* at ¶ 7. Praxair, Inc., a manufacturer of industrial gases and a large consumer of electric power, is located in Pittsburg; like all other Pittsburg residents, Praxair receives its electric services from PG & E. *Id.* at ¶ 5.

Modesto Irrigation District is a state-recognized irrigation district organized pursuant to California Irrigation District Law. *See* Cal. Water Code §§ 20500, *et seq.* Among its utility-related ventures, MID owns and operates facilities for the generation, transmission, and distribution of electric power in a portion of Stanislaus County, California. As its name suggests, MID is a "district" under California law, *see* Cal. Gov't Code § 56036 (defining "district" as an "agency of the state ... for the local performance of governmental or proprietary functions within limited boundaries ..."); as such, MID is an entity of limited powers, and it has specifically circumscribed geographic and "sphere of influence"[4] boundaries. *See* Stip. of Facts, ¶¶ 9 & 12.[5] No part of Contra Costa County, California—in which Pittsburg sits—falls within MID's existing service area or "sphere of influence." *Id.* at ¶ 15.

## I. The Contracts and MID's Plan

In 1994, PG & E entered a Control Area and Transmission Service Agreement with Dynergy Power Services, Inc., a power marketer and a wholesaler of electricity. *See* Stip. of Facts, ¶ 16; Mayer Decl., Exh. B. Approved by the Federal Energy Regulatory Commission ("FERC"),[6] the agreement permitted Dynergy to use PG & E's transmission lines for wholesale electricity customers, but it did not authorize Dynergy to serve any of PG & E's retail (or "end-user") customers. *Id.*[7] In early 1996—at a time roughly contemporaneous with a legislative effort to revamp Califor-

---

**4.** Section 56076 defines "sphere of influence" as a "plan for the *probable* physical boundaries and service area of a local agency ...." Cal. Gov't Code § 56076 (emphasis added). In this sense, a "sphere of influence" is a prospective measure, charting what a city's or a district's boundaries might be at some future point. *Id.* A district's "sphere of influence" is not necessarily coextensive with its existing service area.

**5.** Within MID's current boundaries sits the area between the San Joaquin River on the east, the Tuolumne River on the north, and the Stanislaus River on the south. *Id.*

**6.** Consistent with the Federal Power Act, *see* 16 U.S.C. § 824d(c), the Dynergy–PG & E agreement was submitted to FERC for approval. The agreement became effective on April 14, 1995, making Dynergy and PG & E competitors in the *wholesale* power market, not in the *retail* one.

**7.** The relevant portion of the agreement reads:

[Dynergy] may not use service under this Agreement to sell electricity to a retail customer located within the PG & E utility service territory. [Dynergy] may not desig-

nia's retail electricity industry—MID and Dynergy developed a complicated business plan to provide electric distribution service to one or more retail customers in Pittsburg. *Id.* at ¶ 1. The plan involved a series of contracts between MID, the City of Pittsburg, Dynergy, and others;[8] and it depended on MID's acquisition of a Praxair substation, through which MID hoped to distribute power (at a retail rate) to Praxair itself. *See id.* at ¶¶ 17–19; *see also* Second Am. Compl., ¶¶ 15–18 (noting that a "substation" is a facility that receives high-voltage electric power, converting that power into lower, usable voltages for distribution to consumers); Mayer Decl., ¶ 9 (identifying the "Linde" substation as the one targeted—and as one of multiple Praxair sites); *id.* at Exhs. C & D (Permission Agreement and Equipment Sales Agreement).[9]

With these complex contractual arrangements in place, Dynergy and MID asked PG & E to enter an "interconnection agreement" which would require PG & E to commence delivery of power to the Praxair substation. *See* Second Am. Compl., ¶ 24; *see also* First Am. Compl. (alleging that PG & E had agreed to a

similar agreement—with Dynergy—regarding provision of service and resale opportunities in the Port of Oakland). PG & E refused. *Id.*

## II. *FERC Petitions and the Statutory Framework*

A round of petitions to FERC followed. PG & E filed the first petition with FERC, alleging, *inter alia*, that MID's plan with Dynergy constituted a "sham wholesale" transaction designed to allow MID to select (and to serve) only those retail customers that would be particularly profitable to MID. *See, e.g.*, Req. for Judicial Notice, Exhs. 3 & 6.[10] Both Dynergy and MID opposed PG & E's petition, and MID later filed its own application with FERC, asking that PG & E be compelled to interconnect the Praxair substation. *See id.* at Exhs. 4 & 5. PUC later intervened on PG & E's behalf, concurring with PG & E that MID's business plan contravened the terms of applicable California law, particularly the Cortese–Knox Local Government Reorganization Act. *See id.* at Exh. 6.[11]

The Cortese–Knox Local Government Reorganization Act, *see* Cal. Gov't Code §§ 56000, *et seq.* ("the Act"),[12] is a detailed

---

nate retail loads within PG & E's utility service territory as Transaction Points nor may [Dynergy] schedule to any retail loads within PG & E's service territory as [Dynergy] Loads.
*See* Stip. of Facts, Exh. C.

8. These contracts and agreements included a Permission Agreement with Pittsburg allowing MID to utilize City rights of way in the provision of retail electric services, an Equipment Sales Agreement with Praxair, and a Power Sales Agreement with Dynergy. *See* Stip. of Facts, ¶¶ 17–19; Mayer Decl., Exhs. C–D. Most segments of these agreements are inapposite to the court's consideration of this motion, and they need not be elaborated in detail here.

9. Under the permission agreement between MID and Pittsburg, approximately one-half of the Praxair substation's capacity would have

been devoted to Praxair itself; the remaining portion was supposedly to be distributed among to-be-acquired commercial and residential accounts in Pittsburg, all of which PG & E then held.

10. Dynergy also sought to compel arbitration under its agreement with PG & E. PG & E filed suit in federal court to enjoin any arbitration proceedings, though no order issued. The two have since settled their portion of the dispute.

11. After PUC sought to intervene in the FERC proceeding, MID stayed its interconnection request; to the court's knowledge, it has yet to reactivate that request.

12. Effective January 1, 2001, the Cortese–Knox–Hertzberg Local Government Reorganization Act replaced the 1985 Cortese–Knox

statutory scheme governing, *inter alia,* control of urban sprawl. *See, e.g., City of Shasta Lake v. County of Shasta,* 75 Cal. App.4th 1, 6, 88 Cal.Rptr.2d 863 (Cal.App. 1999). To facilitate local resource management, the Act contemplates the creation of local agency formation commissions ("LAFCOs")[13] in each county of California, *see* Cal. Gov't Code § 56325, and it empowers LAFCOs to make decisions on a variety of urban planning issues. *See, e.g., id.* at §§ 56001 (noting that LAFCOs are "single multipurpose governmental agencies" charged with controlling "the process of municipality expansion"), 56375, 56021. Decisions regarding the scope and potential extension of utility services (e.g., electric services), for example, fall within a county LAFCO's purview. *See* Cal. Gov't Code §§ 56133, 56375; *see also Tillie Lewis Foods, Inc. v. City of Pittsburg,* 52 Cal.App.3d 983, 995, 124 Cal.Rptr. 698 (Cal.App.1975).

Many of the Act's provisions delineate LAFCO and utility-provider rights and obligations. *Id.* Section 56133 of the Act, for example, discusses where and when a city or district may expand the electric services it provides:

> A city or district may provide new or extended services by contract or agreement outside its jurisdictional boundaries only if it first requests and receives written approval from the [LAFCO] in the affected county.

Cal. Gov't Code § 56133(a). Subsections (b) and (c) of section 56133 posit the limited contexts in which a LAFCO *may* authorize a city or district to provide new or extended services outside its jurisdictional boundaries: Subsection (b) allows such authorization only where the desired exten-

sion would fall "within [a district's] sphere of influence in anticipation of a later change of organization"; subsection (c) permits such authorization where the relevant extension is intended "to respond to an existing or impending threat to the public health or safety of the residents of the affected territory ...." *Id.* at § 56133(b)-(c) (adding, for subsection (c), that the entity applying for the contract must provide "documentation of a threat to the health and safety of the public or the affected residents" and ensure that the committee has notified "any alternate service provider ... that has filed a map and a statement of its service capabilities with the commission"). Subsection (e) of section 56133 denotes a handful of contexts in which the mandates of section 56133 do not control *ex ante.*

When MID attempted to distribute electricity to Contra Costa County (that is, to Pittsburg), it did not request or receive approval from Contra Costa County's LAFCO. *See* Stip. of Facts, ¶¶ 22–23. Instead, MID believed that section 56133 did not apply to its electricity-distribution activities at all, so LAFCO preapproval was neither required nor sought. *Id.* at ¶ 24. The validity of MID's interpretation of section 56133 is the legal question at the core of this action.

### III. *Procedural Posture and Analogous Litigation*

An identical legal question—based on an identical MID theory—spurred a brief round of state court litigation, albeit on minimally different facts. *See PG & E v. MID,* Stanislaus County Superior Court, No. 227034. In the late 1990s, MID ex-

---

Act. The new law is not retroactive; as a result, it is not applicable to this action. *See County of Fresno v. Malaga County Water Dist.,* 100 Cal.App.4th 937, 939, 123 Cal. Rptr.2d 239 (Cal.App.2002).

**13.** LAFCOs typically consists of five members, two selected by the relevant county, two selected by the germane cities, and one selected by the other four members. *See* Cal. Gov't Code § 56325.

panded its electricity-distribution services into the so-called "Four Cities Area" of California.[14] MID did so without seeking or securing LAFCO preapproval. In fact, MID expanded into the Four Cities Area without complying with any of the terms of section 56133, growing outside its established "sphere of influence" boundaries into an area already served by PG & E— precisely like the move into Pittsburg.

PG & E believed that MID's Four Cities Area expansion contravened state law (viz., section 56133), and, seeking to prevent the move, PG & E filed an action against MID in Stanislaus County Superior Court. The state trial court agreed with PG & E's interpretation of section 56133, finding that section 56133 applies to MID and that MID is not otherwise excused from the section's procedural mandates. *See* Req. for Judicial Notice, Exhs. 1 & 2. MID appealed. During the pendency of that appeal, the California legislature enacted California Public Utilities Code sections 9610 and 9611, which, taken together, grant MID express—and expressly limited—authority to serve customers in the Four Cities Area *without* LAFCO preapproval. *See* Cal. Pub. Util.Code §§ 9610, 9610. California's Court of Appeal held that this intervening legislative act mooted the Four Cities Area controversy between MID and PG & E, and the appellate court reversed the trial court's decision. *See* Req. For Judicial Notice, Exh. 8 (opinion filed January 7, 2003). The state appellate court's decision did not reach the substance of the section 56133 question. *See id.*

As the parties litigated the Four Cities Area matter in state court, MID filed a complaint against PG & E and Dynergy in this court. In relevant part, MID's complaint alleges that PG & E's efforts to prevent MID's expansion into Pittsburg were unlawfully anti-competitive and monopolistic under the Sherman Act, 15 U.S.C. §§ 1, 2, and related provisions of state law. PG & E filed a timely answer, raising a number of affirmative defenses. On February 2, 1999, this court dismissed MID's clams under Federal Rule of Civil Procedure 12(b)(6), granting MID leave to amend. *See Modesto Irrigation Dist. v. Pacific Gas & Elec. Co.*, 61 F.Supp.2d at 1067–68 (N.D.Cal.1999). MID filed a first amended complaint on March 4, 1999, and this court again dismissed the action under Federal Rule of Civil Procedure 12(b)(6), this time denying leave to amend. *See Modesto Irrigation Dist. v. Pacific Gas & Elec. Co.*, 61 F.Supp.2d 1058 (N.D.Cal. 1999). In an unpublished disposition, the Ninth Circuit reversed, *see Modesto Irrigation Dist. v. Pacific Gas & Elec. Co.*, 54 Fed.Appx. 882 (9th Cir.2002), and MID promptly filed a second amended complaint in this court. The parties subsequently agreed that court resolution of PG & E's eleventh affirmative defense (viz., that MID failed to comply with particular provisions of California law, thus eliminating the prospect of cognizable antitrust injury) could dispose of the action in its entirety; the parties also agreed that a summary judgment motion regarding PG & E's eleventh affirmative defense could be adequately briefed on stipulated facts and considered without additional discovery. PG & E has now filed a motion for summary judgment on its eleventh affirmative defense.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

---

**14.** The "four cities" are Ripon, Escalon, Oakdale, and Riverbank. There is no geographic overlap between the "Four Cities Area" and Pittsburg, California.

burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). When making a summary judgment motion, the moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. To discharge this burden, the moving party must show that the nonmoving party has failed to disclose the existence of any "significant probative evidence tending to support the complaint." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). If the moving party satisfies this initial hurdle, the burden then shifts to the nonmoving party to "go beyond the pleadings, and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548 (citations omitted).

Not all disputes that arise in the course of litigation constitute genuine issues of material fact. A dispute about a material fact is genuine—and thus adequate to survive a motion for summary judgment—"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering motions for summary judgment, the court views the facts—and the inferences drawn therefrom—in the light most favorable to the party opposing the motion. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractor's Ass'n,* 809 F.2d 626, 631 (9th Cir. 1987). In this process, the court does not make credibility determinations. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

■ When interpreting a statute, the court must start with the statutory language itself, *see Gwaltney of Smithfield v. Chesapeake Bay Found.,* 484 U.S. 49, 56, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), reading that language in appropriate context and adhering to ordinary meaning unless the statute itself indicates otherwise. *See FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000); *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979); *United States v. Lewis,* 67 F.3d 225, 228–29 (9th Cir.1995) (adding that statutory phrases must be "construed in light of the overall purpose and structure of the whole statutory scheme").

*DISCUSSION*

To resolve PG & E's motion for summary adjudication, the court must decide whether or not MID is subject to the terms and requirements of California Government Code section 56133. This question is, in many ways, a straightforward one, but before the court can answer it, the court must first address a series of ancillary issues. The court must determine what status MID retains as an electricity provider in California; the court must decide what statutes apply to MID as a matter of state law, assessing whether MID's rights under California law are too inconsistent to coexist; the court must resolve whether any of section 56133's exceptions or related provisions shield MID's conduct; and, finally, the court must decide whether, in light of the court's other conclusions, MID can possibly prove antitrust injury. The court addresses each of these questions below.

I. *MID's Status, the California Constitution, and the Threshold Applicability of Section 56133*

■ For nearly a century, irrigation districts in California have been permitted to

produce, to distribute, and to sell electricity. *See Turlock Irrigation Dist. v. Hetrick*, 71 Cal.App.4th 948, 951, 84 Cal. Rptr.2d 175 (Cal.App.1999) (recounting at length the history of California's irrigation districts; citing Stats.1919, ch. 370, § 1, p. 788). During this time, California's courts have struggled to delimit the "exact legal nature of districts" like MID. *Id.* (attributing this difficulty in part to "the hopelessness of confining districts, public corporations, or municipal corporations within [a] neat box of definition" and in part to the many roles districts play) (internal quotation marks omitted). As a consequence, California's courts have not formulated a "general rule"—or derived a standard label—for entities like MID. *Id.* Instead, California's courts have looked to the nature of the entity at issue, eschewing wholesale reliance on labels. *Id.; see also California Apartment Assn. v. City of Stockton*, 80 Cal.App.4th 699, 707, 95 Cal. Rptr.2d 605 (Cal.App.2000); *Cucamonga County Water Dist. v. Southwest Water Co.*, 22 Cal.App.3d 245, 257, 99 Cal.Rptr. 557 (Cal.App.1971).

Still, perhaps because the state courts have crafted no "general rule," irrigation districts persist in arguing that they are "municipal corporations" under California's constitution, equipped, as such, with the authority and the unfettered right to pro-

vide utility service state-wide. *See id.* at 950–51, 84 Cal.Rptr.2d 175 ; *see also County of Fresno v. Malaga County Water Dist.*, 100 Cal.App.4th 937, 944, 123 Cal. Rptr.2d 239 (Cal.App.2002); Cal. Const. Art. XI, § 9(a). MID made precisely that claim in the analogous Four Cities Area state court litigation, and it restates precisely that claim here.

It is no great mystery why MID would prefer to be categorized outright as a "municipal corporation"[15] under the California Constitution. Article XI, section 9(a) of the California Constitution allows "municipal corporation[s][to] establish, purchase, and operate public works to furnish its inhabitants with light, water, [and] power," and it permits municipal corporations to "furnish those services *outside [district] boundaries ...*." Cal. Const. Art. XI, § 9(a) (emphasis added). Were MID a true and unqualified "municipal corporation" under Article XI, section 9(a), MID's "jurisdiction" would be coextensive with California's state borders. Its unilateral expansion into Pittburg (or the Four Cities Area), thus, would be a lawful exercise of MID's state constitutional power—not a violation of state *statutory* law.

But what MID's attempt to declare itself a "municipal corporation" ignores is as significant as what it concedes. California's courts have long assured that the "munici-

15. It is likewise obvious why MID opted not to comply with the procedures set forth in section 56133. Nearly a century ago, the state legislature passed the Raker Act, authorizing San Francisco to dam the Hetch Hetchy Valley. As *quid pro quo* for this authorization, the legislature conditionally preserved the pre-existing water rights of two irrigation districts—viz., MID and MID's sister irrigation district in Turlock—jointly entitling the two to a particular portion of Tuolumne River water. *See* 38 Stat. 242, 246. Pursuant to the Raker Act, these water rights held firm only if the area included in the two districts did not "in the aggregate ... exceed three hundred thousand acres of land." *Id.*

Between them, the Modesto and Turlock irrigation districts currently include almost—but not quite—300,000 acres, bringing the two very near the threshold of the Raker Act limit. Proper annexation of additional area under section 56133 (whether of Pittsburg or of the Four Cities Area) would push the districts' aggregate coverage over the 300,000 acre threshold, violating the Raker Act bargain and putting at risk the districts' attendant water rights in the Tuolumne River. *See* Req. for Jud. Notice, Exh. 22 at p. 241. Only through non-annexation-like (i.e., non-section 56133) acquisition, then, can MID expand its area of coverage without paying a substantial attendant price. *Id.*

pal corporation" label is neither talismanic nor particularly instructive in this context. *See, e.g., Turlock Irrigation Dist. v. Hetrick,* 71 Cal.App.4th at 951, 84 Cal.Rptr.2d 175 (adding that "[i]rrigation districts are sometimes referred to as municipal corporations, but it seems that they are not municipal corporations in the strict or proper sense of that term . . . .") (citing, e.g., *Whiteman v. Anderson–Cottonwood Irrigation District,* 60 Cal.App. 234, 237, 212 P. 706 (1922)) (internal quotation marks omitted). Indeed, state courts have repeatedly rejected arguments effectively identical to the one MID (re)posits here, *see, e.g., County of Fresno,* 100 Cal. App.4th at 944, 123 Cal.Rptr.2d 239; in the Four Cities Area action, in fact, a state court rejected an identical argument on nearly identical facts. For years, California's courts have interpreted Article XI, section 9(a) *not* to "preclude the Legislature from otherwise regulating municipal public utilities" like MID. *See, e.g., California Apartment Assn.,* 80 Cal.App.4th at 707, 95 Cal.Rptr.2d 605; *Cucamonga County Water Dist.,* 22 Cal.App.3d at 257, 99 Cal.Rptr. 557. It is the nature of the entity at issue that matters, the state courts have repeatedly reminded, not otherwise meaningless appellations—whether "municipal corporation" or otherwise. *Id.*

This is particularly true for irrigation districts like MID. "[R]egardless of the legal nature of an irrigation district," the California Court of Appeals has observed, "it is *universally recognized* that an irriga-tion district has *only those powers granted to it under the enabling legislation.*" *Turlock,* 71 Cal.App.4th at 952–53, 84 Cal. Rptr.2d 175 (emphasis added). Irrigation districts like MID simply are not pure "municipal corporations" under Article XI, section 9(a), and they are not empowered as such.[16] *Id.; see also DeVita v. County of Napa,* 9 Cal.4th 763, 797, 38 Cal.Rptr.2d 699, 889 P.2d 1019 (Cal.1995); *Embarcadero Municipal Improvement Dist. v. County of Santa Barbara* 88 Cal.App.4th 781, 786, 107 Cal.Rptr.2d 6 (Cal.App.2001); *Baldwin v. County of Tehama,* 31 Cal. App.4th 166, 178, 36 Cal.Rptr.2d 886 (Cal. App.1994) ("Local districts established by statute inherently differ in kind from municipal corporations. They draw their authority from the enactments which create them. They are created for limited purposes[ and] exercise limited powers . . . ."); *Bottoms v. Madera Irr. Dist.,* 74 Cal.App. 681, 694, 242 P. 100 (Cal.App.1925) (". . . such agency has only such powers as are given to it by the act of the Legislature under and by virtue of which it exists . . ."); Req. for Jud. Notice, Exh. 21 (Assembly Committee on Utilities and Commerce Notes) ("In that irrigation districts have not definitively been declared [to be] municipal corporations, and the Legislature has not been precluded from regulating municipal public utilities, the Legislature's authority in this matter does not appear to have been precluded by the Constitution.").[17]

---

**16.** In arguing to the contrary, MID relies on factually and legally distinct doctrine, often misquoting that doctrine as well. *See, e.g., County of Mariposa v. Merced Irrig. Dist.,* 32 Cal.2d 467, 196 P.2d 920 (1948).

**17.** In declaring irrigation districts subject to germane statutory limits, California's courts have not read the word "jurisdiction" out of the relevant statutes. The courts have simply construed "jurisdiction" to denote precisely what it generally means in this context, viz., the political boundaries of the district in which the irrigation agency sits. Portions of California statutory and case law confirm as much. *See, e.g.,* Cal. Gov't Code § 53118 (using the term "jurisdictional boundary" to refer to a particularized geographic and / or political area); Cal. Election Code §§ 12262, 17499(b) (same); *County of San Francisco v. County of San Mateo,* 10 Cal.4th 554, 559, 41 Cal.Rptr.2d 888, 896 P.2d 181 (1995). What Indiana and Ohio law suggest, however heavily MID relies on them, is simply immaterial.

■ Irrigation districts, rather, are empowered by and through particularized "enabling legislation." *Id.* The pertinent "enabling legislation" in this context (viz., the Cortese–Knox Act) expressly defines irrigation districts as "district[s] of *limited* powers," *see* Cal. Gov't Code § 56037 (emphasis added), assuring that individual districts are confined to circumscribed service areas and "spheres of influence." *Id.* at § 56036; *see also County of Fresno,* 100 Cal.App.4th at 944, 123 Cal.Rptr.2d 239 ("As a district of limited powers, Malaga's authority is restricted to those powers expressed and implied in its enabling act."). Subject to a selection of limited exceptions, the same "enabling legislation" precludes public entities like MID from extending areas of service beyond existing boundaries absent prior LAFCO approval—just as MID has attempted here.[18] *See* Cal. Gov't Code § 56133; *see also* Req. for Jud. Notice, Exh. 16 (discussing the Sacramen-

to Municipal Utility District's application to move outside its establish boundaries); Stats.1993, ch. 1307, § 2 (noting that section 56133 "plugged [the] loophole" that allowed agencies to circumvent the LAF-CO process).[19]

The Act makes plain that where an irrigation district wishes to "extend[ ][its] services by contract or agreement outside its jurisdictional boundaries" the district must "first request[ ] and receive[ ] written approval from the LAFCO in the affected county." *Id.* MID did the former (i.e., extend its services outside its jurisdictional boundaries), but it did not do the latter (i.e., receive written LAFCO pre-approval).[20] MID thus failed to comply with the terms of its "enabling legislation." It has, in short, failed to satisfy the requirements of section 56133.

In a closely analogous context, a state trial court reached the same conclusion.

---

**18.** That MID recently received—via the largess of California's legislature—a specific, geographically-limited exemption to section 56133 for its move into the Four Cities Area confirms as much. *See* Cal. Gov't Code §§ 9610, 9611 (noting that the proscriptions of the section do "not apply to electric services provided by [MID] within the geographic areas described in subdivisions (a) and (b) of [s]ection 9610," that is, in the "Four Cities Area"). If section 56133 did not apply to MID's move into the Four Cities Area, a legislative exemption would have been logically and legally unnecessary. Indeed, MID needed a legislative exemption to enter the Four Cities Area without LAFCO preapproval precisely *because* it could not lawfully do so otherwise. Unless it complies with section 56133—or secures another legislative exemption—MID *a fortiori* cannot enter Pittsburg (or any other area outside its sphere of influence) either.

**19.** In an attempt to prove section 56133 inapplicable, MID argues that the relevant statutory "loophole" concerned activities among agencies already subject to particular LAFCO's purview. *See* Pl.'s Opp. at 8–10. This theory depends on the (erroneous) predicate assumption that MID had statewide jurisdic-

tion *ex ante;* it misstates the purpose of section 56133; and it elides the effect of the statute overall. Nothing in the Act or its legislative history suggests that section 56133 targeted a narrow or limited subset of "districts" (e.g., "park districts"), and MID cannot legitimately argue otherwise. *See* Cal. Govt.Code § 56036(a) ("'District' or 'special district' means an agency of the state, formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries.").

**20.** The 1997 amendment to section 56133 does not change the section's core statutory charge, nor does it exempt otherwise covered districts altogether. The 1997 amendment merely offers a narrow exception to section 56133's LAFCO pre-approval requirement, namely where expansion of service would not "involve the acquisition, construction or installation of electric distribution facilities." *See* Req. for Jud. Notice, Exh. 10. MID's move into Pittsburg undeniably involved the acquisition of electric distribution facilities— and MID concedes as much—so the 1997 amendment does not apply here.

This court is always reluctant to second-guess California's courts on issues of California state law, and it is only more hesitant to do so where, as here, California's courts have reached a manifestly sound determination. *Id.* MID is not a pure "municipal corporation" under Article XI, section 9(a), and section 56133 applies to MID's provision of electric services. Thus, unless a specific section 56133 exception applies, or section 56133 is otherwise invalid, MID is required to seek LAFCO approval for new or extended services outside its jurisdictional boundaries—something it has not done here.[21]

## II. *The Meaning of Section 22120 and Section 56133's Related Provisions*

■ Because the court finds that the Act's terms apply to MID, it must address two subsidiary questions: first, whether section 56133 is irreconcilably inconsistent with other provisions of state law (specifically, section 22120 of California's Water Act); and, second, whether any of section 56133's related language excuses MID's unapproved expansion into Pittsburg. The first question is easily resolved: Section 56133 does not repeal—impliedly or otherwise—Water Code section 22120. *See* Cal. Water Code § 22120. In pertinent part, section 22120 permits irrigation districts to "sell, dispose of, and distribute electric power for use outside of its boundaries." *Id.* The language of section 22120 is permissive (i.e., "*may* sell ..."), stating only that districts *can* "sell, dispose of, and distribute," not that they have an uncompromised or unilateral right to do so. *Id.*; *see also* Cal. Water Code § 22115 (stating, likewise, that "[a]ny district heretofore or hereafter formed *may* purchase or lease electric power ... and *may* provide for the acquisition, operation, leasing, and control of plants for the generation, transmission, distribution, sale, and lease of electric power ...") (emphasis added).[22] Like other provisions of California's law, section 56133 cabins districts' right to "sell, dispose of, and distribute" utility services, specifying *how* and *when* districts may do so but *not* eliminating those rights altogether. *See* Cal. Gov't Code § 56133. This sort of statutory qualification of preexisting statutory rights is not uncommon under California law, *see, e.g., Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,* 17 Cal.4th 553, 569, 71 Cal.Rptr.2d 731, 950 P.2d 1086 (Cal.1998); *People v. Atkinson,* 115 Cal. App.2d 425, 427, 252 P.2d 67 (Cal.App. 1953) (discussing, in a distinct context, the "continuance of [an] old law" consistent with the "modification[s]" inserted by a new one), and nothing in California law

---

**21.** It follows from this conclusion that MID's "jurisdictional boundaries" do not embrace the entire state of California. Like many other state statutory provisions, section 56133 speaks of a district's "jurisdictional boundaries." *See* Cal. Gov't Code § 56133. These "jurisdictional boundaries" are identical to the political (rather than "land") boundaries of the district in which the irrigation agency sits, and they are, by extension, necessarily smaller than that agency's "sphere of influence." *See id.* (presupposing that "jurisdictional boundaries" are smaller than a district's "sphere of influence" by permitting expansion beyond the former but within the latter). Since MID's "sphere of influence" is not equivalent to the entire state of California, its "jurisdictional boundaries"—which are *de facto* less expansive than "spheres of influence"—cannot possibly include all of California. MID's claims to the contrary are simply dissimulative and facile.

**22.** MID cites a number of other Water Code sections to suggest that it can provide electric services statewide, but when scrutinized closely, MID's argument amounts to little more than historical misdirection. None of the statutes or cases cited suggest that MID is empowered to expand at its whim. They only suggest that MID *may* expand in certain contexts, like those elaborated in section 56133. *See, e.g., Yolo v. Modesto Irrigation Dist.,* 216 Cal. 274, 277, 13 P.2d 908 (Cal.1932); Cal. Water Code §§ 22116 & 22117.

suggests that the imposition of such procedural limitations constitutes any sort of legislative repeal, implied or otherwise. *See, e.g., California State Employees Ass'n v. California Pub. Employees' Retirement Syst, Bd. of Admin.*, 113 Cal.App.4th 137, 144, 5 Cal.Rptr.3d 922 (Cal.App.2003) ("Repeals by implication are disfavored and are recognized only when potentially conflicting statutes *cannot be harmonized.*") (quoting *Nickelsberg v. Workers' Comp. Appeals Bd.*, 54 Cal.3d 288, 298, 285 Cal.Rptr. 86, 814 P.2d 1328 (1991)) (emphasis added). Section 22120 and section 56133 can—and do—coexist easily; the former does not permit MID to ignore the terms of the latter.

■ Nor does anything else in section 56133—whether the limited authorizations discussed in subsections (b) and (c) or the exceptions of subsection (e)—excuse MID's unauthorized expansion into Pittsburg. Subsection (b) of section 56133, as noted, applies only where a district attempts to expand *"within* [that district's] sphere of influence in anticipation of a later change of organization"; in attempting to grow *outside* its existing "sphere of influence," MID lands outside subsection (b)'s protection. *See* Cal. Gov't Code § 56133(b) (emphasis added); *see also* Cal. Gov't Code § 56076 (defining "spheres of influence" as plans "for the probable physical boundaries and service area of a local agency" or district). Subsection (c), in turn, applies only where a district expands in response to an "existing or impending threat to public health or safety," and even then only after proper "documentation" and no-

tice are provided; none of these factors pertain here. *Id.* at § 56133(c).

■ And the series of exceptions listed in subsection (e) is inapplicable as well—as MID conceded during oral argument. In pertinent part, subsection (e) reads:

> This section does not apply to contracts or agreements solely involving two or more public agencies where the public service to be provided is an alternative to, or substitute for, public services already being provided by an existing public service provider and where the level of service to be provided is consistent with the level of service contemplated by the existing service provider.... This section does not apply to an extended service that a city or district was providing on or before January 1, 2001. This section does not apply to a local publicly owned electric utility, as defined by Section 9604 of the Public Utilities Code, providing electric services that do not involve the acquisition, construction, or installation of electric distribution facilities by the local publicly owned electric utility, outside of the utility's jurisdictional boundaries.[23]

*See* Cal. Gov't Code § 56133(e).[24] Of the three relevant "does not apply" clauses, the first (viz., the clause discussing contracts) might seem to present the most difficult question, but it does not apply here. As a part of its expansion plan, MID entered a series of contracts with a variety of entities, including a permission agreement with the City of Pittsburg. The permission agreement purported to

---

**23.** In its opposition brief, MID offers a curious discussion of the coverage of the 1997 amendment, referencing portions of the amendment's legislative history (viz., those discussing the Sacramento Municipal Utility District) and Water Code sections discussing sales of "surplus" power. *See* Pl.'s Opp. at 11. The argument is neither directly germane nor particularly instructive, nor is it correct.

*See* Req. For Jud. Notice, Exh. 17 (Legislative History) (discussing expressly the application of the amendment to "more than" the Sacramento Municipal Utility District).

**24.** California's courts have yet to discuss subsection (e) in any detail, but the language of the statute conduces to straightforward explication.

allow MID to offer electric services in the Pittsburg area, seemingly confirming Pittsburg's approval of—or acquiescence in—MID's expansion. But Pittsburg's approval of MID's move can only go so far. It cannot itself permit MID to expand absent LAFCO preapproval, and it cannot function as a surrogate for the type of agreement envisioned by subsection (e). Under subsection (e), a district need not comply with section 56133 where there exist "contracts or agreements solely involving two or more public agencies where the public service to be provided is an alternative to, or substitute for, public services already being provided by an existing public service provider and where the level of service to be provided is consistent with the level of service contemplated by the existing service provider." *Id.* Were Pittsburg granting MID the right to compete with (or to replace) the City of Pittsburg *itself* as a supplier of utilities and services, and were MID promising to offer services on a par with those already offered to Pittsburg's residents by PG & E, the relevant portion of subsection (e) might apply. But the MID–Pittsburg agreement does neither. It simply condones—and attempts to effectuate—MID's attempt to select a group of particularly profitable customers (notably, Praxair) while usurping PG & E's status as Pittsburg's state-licensed electricity provider. No guaran-

tees are made regarding the level and extent of service MID plans to offer, and no legitimate pro-competitive benefit accrues to anyone, least of all Pittsburg's residents. Subsection (e) does not sanction the kind of end-run bargain MID and the City of Pittsburg have crafted, and the first "does not apply" clause of subsection (e) cannot excuse MID's unauthorized expansion into Pittsburg. *Id.*[25]

The same is true of the remaining two "does not apply" clauses. For one, MID never actually provided electric service to Pittsburg, delaying its project after PUC intervened at FERC on PG & E's behalf, so it was not providing an extended service "on or before January 1, 2001." *Id.* For another, MID's expansion into Pittsburg required the acquisition of electric distribution facilities (viz., one of Praxair's substations), so the final clause does not protect MID's expansion, either. *Id.* Indeed, nothing in subsections (b), (c), or (e) permit the kind of unauthorized expansion MID has attempted. The LAFCO preapproval provisions of section 56133 thus apply to MID's move into Pittsburg; as MID readily concedes, it has failed to abide these terms.

## III. *Antitrust Injury*[26]

■ Courts have long recognized that "an action under the antitrust laws will not lie where the business conducted by the

25. The City of Pittsburg is not a utility provider, so its agreement with MID does not directly concern the provision of alternative or substitute electric services. And to say that Pittsburg could enter a contract with MID to permit MID to offer services would strip the PUC and CPUC processes of meaning and effect.

26. According to MID's papers, this issue is both improperly before the court and already resolved by the Ninth Circuit. · *See* Pl.'s Opp. at 22–23; *Modesto Irrigation Dist. v. PG & E*, 54 Fed.Appx. at 884. But MID's argument is incorrect in both parts, and MID conceded as

much during oral argument. The court is mindful that the Ninth Circuit held that MID can *allege* antitrust injury in this case. *Id.* Even if MID can *allege* antitrust injury, however, it cannot necessarily *prove* it; indeed, the fact that MID violated section 56133 confirms that it cannot. It follows that MID's antitrust action against PG & E cannot survive. This court will not force PG & E to engage in the unnecessary exercise of filing a separate motion asking the court explain the significance and unavoidable consequence of this conclusion. During oral argument, even MID agreed that such extra steps are unnecessary.

plaintiff, and alleged to have been restrained by the defendant, was itself unlawful." *Jenkins v. Greyhound Lines, Inc.*, 1971 WL 529, *1 (N.D.Cal.1971) (Schacke, J.) (citing, e.g., *Okefenokee Rural Mem. Corp. v. Florida Power & Light Co.*, 214 F.2d 413 (5th Cir.1954)); *Cottonwood Mall Shopping Ctr. v. Utah Power & Light Co.*, 440 F.2d 36, 38–40 (10th Cir. 1971). This is so, courts have reasoned, because a party cannot prove a cognizable antitrust injury when it itself engaged in unlawful conduct *ex ante. See, e.g., Snake River Valley Electric Ass'n v. Pacificorp*, 357 F.3d 1042, 1050 n. 8 (9th Cir.2004) ("[E]ven if PacifiCorp acted anti-competitively by refusing to wheel [power to the association], there is no injury to [the association] because it could not have taken any of PacifiCorp's customers *absent affirmative action by the PUC ....*") (emphasis added); *see also Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (noting that, to succeed on an antitrust claim, a plaintiff must "*prove* the existence of *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent") (citation and internal quotation marks omitted; first emphasis added); *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1376 (9th Cir.1996) (holding that a plaintiff who is neither a proper competitor nor a legitimate consumer in the relevant market cannot claim to have suffered cognizable antitrust injury); *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 415 (3d Cir. 1997).

Adhering to this well-founded principle, the court finds that MID cannot *prove*—as opposed to *allege*—that it suffered antitrust injury in this instance. MID possessed neither the legal right nor the necessary LAFCO permission to expand its services into Pittburg. *Id.* Instead, MID attempted to enter Pittsburg unilaterally, thereby contravening controlling state law and attempting to derive income without attendant "legal right." *See National Ass'n of Pharmaceutical Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 913 (2d Cir.1988) (citations omitted). Because MID's conduct was unlawful by its own terms, PG & E's response—however anti-competitive or seemingly monopolistic—could not inflict an cognizable antitrust injury; i.e., MID cannot *prove* it sustained cognizable antitrust injury here. *Id.; see also Snake River Valley Electric Ass'n*, 357 F.3d at 1050 n. 8. Absent the ability to prove such an injury, MID's antitrust claims are untenable at their core. *See Atlantic Richfield Co.*, 495 U.S. at 334, 110 S.Ct. 1884.[27]

*CONCLUSION*

Defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

■■■■■■■■■■■■■■■■■■■

---

**27.** The elimination of MID's antitrust claims disposes of all claims in this action. MID's second amended complaint does refer to "related state law claims," but *all* of the claims actually articulated in the complaint are antitrust claims. Neither party disputes this conclusion.